IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGINALD A. ROBERTS          :          CIVIL ACTION
         Plaintiff,          FILED

JUL 2 0 2011

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

v.          :

RISA VETRI FERMAN, et al.          :
         Defendants.          :          NO. 09-4895

## MEMORANDUM AND ORDER

L. FELIPE RESTREPO          JULY 19, 2011
UNITED STATES MAGISTRATE JUDGE

On October 23, 2009, Plaintiff, Reginald Roberts filed a complaint against Defendants,

Montgomery County and a number of County employees, alleging race discrimination and

retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, and the

Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* Plaintiff also alleged violations of his

federal civil rights pursuant to 42 U.S.C. § 1983. Before the Court is Defendants' Motion for

Summary Judgment and Statement of Material Undisputed Facts (Docs. 103, 104) (hereinafter

cited as "Defs.' Mot." and "Defs.' Facts"), Plaintiff's Response and Statement of Undisputed

Facts (Doc. 109) (hereinafter cited as "Pl.'s Resp." and "Pl.'s Facts"), and Defendants' replies to

Plaintiff's Response (Docs. 111, 112), as well as Plaintiff's supplementary documents (Docs.

113, 115, 116). Also before the Court is Plaintiff's Motion for Partial Summary Judgment

(Docs. 32, 33, 77, 78) (hereinafter cited as "Pl.'s Mot."), Defendants' responses thereto (Docs.

36, 83, 85), and Plaintiff's replies (Docs. 38, 84).[1]  Oral argument was held before the Court on

April 28, 2011.[2]  Upon careful consideration of the parties' submissions and the joint appendix

(hereinafter cited as "J.A.") submitted therewith and for the reasons set forth below, Defendants'

motion is granted in part and denied in part and Plaintiff's motion is denied.

## I.  FACTUAL BACKGROUND

Plaintiff, Reginald Roberts, is an African-American male who was hired by Montgomery

County as a County Detective on March 15, 1999.  (Pl.'s Facts 1; J.A. 1704).  He was hired to

work on the Narcotics Enforcement Team ("NET") for the County.  (Pl.'s Resp. 1.)  The NET

offices, including Plaintiff's office, were situated in a house ("NET House"), the location of

which was generally kept confidential from the public.  (See J.A. 35, 41.)  Beginning in January

2007, Plaintiff was directly supervised by Defendant Stephen Forzato, who was promoted to

Lieutenant in the Montgomery County Detective Bureau and oversaw NET.  (J.A. 713, 726.)

Defendant Oscar Vance, Chief of the Montgomery County Detective Bureau, and Defendant

---

[1] By Order filed September 10, 2010 (Doc. 50), the Court denied Plaintiff's Second Motion for Partial Summary Judgment without prejudice to renew.  Plaintiff renewed his Second Motion for Partial Summary Judgment in accordance with the Court's instructions, given during a September 9, 2010 hearing on the record.  During the hearing, the Court instructed Plaintiff that if he wished to renew Document 32, he must only provide notice via a one-sentence memorandum, (Hr'g Tr. 22-23, Sept. 9, 2010), which would, by implication, incorporate his initial motion.  Accordingly, the Court considers Plaintiff's original Motion (Doc. 32), together with his Renewal Notice and any exhibits attached thereto (Docs. 77, 78), as a new Motion for Summary Judgment subject to Federal Rule of Civil Procedure 56.

[2] The record for summary judgment motions was deemed closed by the Court as of its April 29, 2011 Order (Doc. 119).  Therefore, Plaintiff's Supplemental Notice to the Court (Doc. 125), which was filed on May 11, 2011, was not considered by the Court for purposes of the pending motions for summary judgment.

Samuel Gallen, the County's Deputy Chief, also served in supervisory roles over NET operations. (See J.A. 309, 814.) As a county detective, Plaintiff was an at-will employee of Defendant District Attorney Risa Ferman. (See J.A. 1314-15.)

## A.   Plaintiff's Heart and Lung Act benefits claim

Around January 15, 2007, Plaintiff began complaining to his new supervisor, Lieutenant Forzato, about hazardous conditions in his office related to a leak in the ceiling or roof of the NET House. (J.A. 39.) In January and May 2007, Lieutenant Forzato sent letters to Continental Realty, the NET House property manager, asking for repair to the NET House roof.[3] (J.A. 1812.)

In late 2007, Continental Realty sent a crew to fix the roof; however, upon learning that the crew was composed of work release inmates, Lieutenant Forzato complained, and Continental Realty reported that they would send another crew. (J.A. 1812.) The second crew sent by Continental Realty merely looked at the problem but did not repair it. (Id.) After learning that Continental Realty would not immediately fix the problem because of budget concerns, Lieutenant Forzato instructed Plaintiff to move out of his office and work from the wire room two floors down.[4] (Id.) After his office move, Plaintiff would still return to his old office to retrieve files. (J.A. 30, 1812.) The roof was not repaired until late 2007. (J.A. 1815.)

Plaintiff testified that earlier in the year, before November 2007, he began feeling ill with breathing problems, and those problems gradually worsened throughout the course of the year.

---

[3] Plaintiff also prepared a letter in October 2007 requesting the same. (J.A. 1812.)

[4] Plaintiff testified that the wire room was located one level above the basement floor. (J.A. 29.)

(J.A. 29.)  Although Plaintiff noticed that his symptoms were worse when he was in his office, he did not proactively ask for his office to be moved prior to the Lieutenant's eventual decision to move him.  (Id.)  Instead, he asked that the problem be remedied.  (Id.)  Due to his pulmonary illness, Plaintiff took leave from his employment beginning on December 21, 2007 and remained out until April 28, 2008.  (J.A. 42; Pl.'s Facts 1.)  A January 28, 2008 inspection of the NET House by an industrial hygiene specialist revealed fungal growth in Plaintiff's office.  (J.A. 1958-84; Pl.'s Facts 3.)  In early 2008, before Plaintiff returned from sick leave, these problems were remedied.  (See J.A. 581-82.)

In February 2008, while out on sick leave, Plaintiff submitted a request to the Montgomery County Human Resources Department to receive benefits under the Pennsylvania Heart and Lung Act, 53 P.S. § 637 ("Heart and Lung Act").  (J.A. 1847.)  Peter Leis, former Director of Human Resources for Montgomery County, sent a letter to Plaintiff dated February 26, 2008, which stated that the Heart and Lung Act required a medical diagnosis and return to work date in order to make a decision on Plaintiff's eligibility for the benefits.  (J.A. 1875.)  The letter stated: "At this time, we are not able to grant you benefits under the Heart & Lung Act. Your request will be reviewed again when more information is received."  (Id.)

Plaintiff's former attorney, Blake Dunbar, sent a letter to Mr. Leis dated March 10, 2008, requesting that the County provide Plaintiff with benefits under the Heart and Lung Act, (J.A. 1885-86), to which there was no response, (see J.A. 1888).  Mr. Dunbar subsequently requested a Local Agency Hearing on Plaintiff's behalf on April 3, 2008.  (J.A. 1888.)  Correspondence continued between Mr. Dunbar, the County Solicitor's office, and defense counsel for several months regarding Plaintiff's Heart and Lung benefits.  (J.A. 1889-1915.)  Dr. Joseph DiMino, the

Medical Director for the Montgomery County Health Department, recommended to the County Solicitor's office on October 9, 2008 that the County grant Plaintiff benefits under the Heart and Lung Act. (J.A. 1918.)

On October 21, 2008, Mr. Dunbar requested that the County participate in arbitration with the American Arbitration Association to resolve the issue of Plaintiff's Heart and Lung Act benefits. (J.A. 1907-1909.) The County declined to participate in such arbitration. (J.A. 1910-11.) Nevertheless, counsel for the Defendants agreed in early 2009 that Plaintiff was entitled to Heart and Lung benefits and should have been paid previously. (J.A. 1922.) Correspondence between counsel for Plaintiff and counsel for Defendants continued throughout 2009 as the parties attempted to work out the details of benefits owed. (See J.A. 1924-44.) At a hearing before this Court on September 9, 2010, Plaintiff was presented with a check for $36,966.51 for benefits under the Heart and Lung Act.[5] (See Hr'g Tr. 15-18, Sept. 9, 2010.)

## B.   Plaintiff's performance and termination

For his first several years as a Montgomery County Detective, Plaintiff received strong evaluations; his 2001, 2003, 2004, 2005 performance evaluations reflected a rating of "good," "very good," or "excellent" in all categories. (J.A. 1743-59.) These evaluations were completed by Plaintiff's former supervisors, Francis Bason and Anthony Spagnoletti. (Id.)

When Defendant Forzato was promoted to Lieutenant in January 2007 and took over the NET House, he held a meeting with NET employees to convey changes he would be making to

---

[5] Plaintiff accepted the check at the hearing and subsequently cashed the check. (See J.A. 104.)

the unit that he considered important and to "let them know what [he] expected from them." (J.A. 722.) Plaintiff received a memo from Lieutenant Forzato in November 2007 that included performance measures and suggested areas for improvement. (J.A. 42-43.) On December 3, 2007, Plaintiff met with Lieutenant Forzato in the Lieutenant's office to discuss Plaintiff's performance. (J.A. 68.) During that meeting, Plaintiff was told he needed to work on bigger cases or more cases. (Id.) On December 18, 2007, Plaintiff met with Chief Vance, Deputy Chief Gallen, and Lieutenant Forzato at Plaintiff's request to discuss the performance measures and work reprimands given to Plaintiff by Lieutenant Forzato. (J.A. 69, 869.) As noted above, Plaintiff then took extended sick leave beginning on December 21, 2007 and remained out of the office until April 28, 2008. (J.A. 42; Pl.'s Facts 1.)

On April 16, 2008, before Plaintiff returned from sick leave, Chief Vance told Plaintiff that Plaintiff was going to be transferred to the newly-formed Special Investigation Unit ("SIU") in the District Attorney's office. (J.A. 56, 463-64.) The SIU was to be headed by Lieutenant Mark Bernstiel, and Chief Vance felt that the SIU would be a good place for Plaintiff to improve his work habits and performance. (J.A. 464.) Knowing that he was being transferred out of the NET House, Plaintiff went to the house on April 26, 2008 "to see the renovations that they did to [his] office" and to see "what they did with the items that belonged to [him] there," even though he did not want them back. (J.A. 56-57.) After arriving, he left briefly to purchase two disposable cameras to take pictures of the office. (Id.) Once back at the office, he noticed a photograph of five black women on the refrigerator of the office. (J.A. 56.) Plaintiff testified that he took pictures of the refrigerator and his former office, and may have taken over fifty-four

photographs, but does not remember how many he took.  (J.A. 57.)[6]

On April 28, 2008, Plaintiff's first day reporting back to work, he met with Chief Vance and told Chief Vance that he believed that Lieutenant Forzato "was trying to fire him and set him up for failure." (J.A. 448.)  Plaintiff stated that he believed that the Lieutenant did not give Plaintiff help "working the wire" for this reason, and as a consequence, Plaintiff only had two cases.  (Id.)

Plaintiff filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") on May 14, 2008.[7] (J.A. 70, 2003-12.)  On May 14, 2008, he also prepared an internal complaint to be sent to various County leaders that Plaintiff mailed several weeks later.  (See J.A. 70.)  In early June 2008, Defendant Vance received the packet from Plaintiff, which included a letter stating that Plaintiff found several items posted on the refrigerator of the NET House, including a photograph and placard, to be "racially offensive," "degrading," and "insensitive" to Plaintiff.  (J.A. 70, 1991-92.)  The letter discussed the photograph, depicting five black women, taped on the refrigerator door, stating that it was "sexually offensive" and displayed "racial stereotypes."  (J.A. 1992.)  The letter concluded:

> Chief Vance, I have serious concerns, not just with the placard, but with a culture that would even permit a racially offensive placard and sexually offensive photograph to be displayed.  I hope this issue will receive the immediate attention of the Montgomery County Board of Commissioners, Montgomery County Human Resources, Montgomery County District Attorney's Office and the Montgomery County Detective Bureau.

---

[6] Plaintiff testified that he had also taken pictures of the mold in his office sometime in 2007. (J.A. 57.)

[7] Plaintiff's May 14, 2008 PHRC filing was the first of three.  The two subsequent filings took place after his termination in August 2008.  (J.A. 70.)

(Id.) Photographs of the items on the NET House refrigerator were enclosed with Plaintiff's letter. (J.A. 1993-95.) By separate letter, also dated May 14, 2008, Plaintiff requested that Chief Vance distribute the packet to various Department Heads, including Risa Ferman. (J.A. 1990.) Copies were distributed as directed by Chief Vance's office on June 7, 2008. (J.A. 1992.)

After receiving and reading the packet of materials, Ms. Ferman directed Chief Vance to conduct an investigation immediately. (J.A. 162.) Ms. Ferman chose Chief Vance to conduct the internal investigation because she thought he was the most appropriate person for such a task and because "[h]e had more investigative experience than anyone within the Detective Bureau." (J.A. 164.) The investigation lasted approximately one month from start to finish. (Id.)

During the course of the investigation, Ms. Ferman learned that Plaintiff had removed and taken possession of the placard from the NET House refrigerator. In addition, Ms. Ferman learned from Chief Vance that Plaintiff admitted to taking photographs of the interior of the NET House and distributing them to individuals outside of the law enforcement community. (J.A. 2199-2201.)[8] Ms. Ferman demanded, in a letter to Plaintiff dated June 30, 2008, that Plaintiff return to Chief Vance the placard in Plaintiff's possession and that Plaintiff "immediately cease the disclosure and dissemination of confidential law enforcement information." (Id.)

At the conclusion of the internal investigation, Ms. Ferman determined that Plaintiff's complaints, memorialized in his May 14, 2008 letter to Chief Vance, were unfounded. (J.A. 2015.) Ms. Ferman communicated the results of the investigation to Plaintiff by way of a letter,

---

[8] Plaintiff testified that he showed copies of the pictures taken on April 26, 2008, to his mother, his pastor, and two individuals associated with the Norristown NAACP. (J.A. 58.) Plaintiff confirmed that the pictures showed an image of Lieutenant Forzato's son and a placard for Tri-State Landscaping, which was used in undercover operations. (J.A. 76.)

dated July 18, 2008.  (Id.)

A fact-finding conference, related to Plaintiff's May 14, 2008 complaint filed with the

PHRC, was held on August 7, 2008.  (J.A. 70.)  Plaintiff was terminated by Montgomery County,

at the direction of District Attorney Ferman, on August 8, 2008.  (J.A. 2183.)  Ms. Ferman

testified that the primary reason she terminated Mr. Roberts from his position as County

Detective was because he violated the confidentiality of the NET office by taking photographs of

the inside of the NET House and sharing those photographs in the community.  (J.A. 207-08.)

Chief Vance testified that Plaintiff was discharged for "poor judgment, for working condition –

for working habits and multiple, multiple performance issues."  (J.A. 356.)

On September 4, 2008, Plaintiff filed another complaint with the PHRC, specifically

pertaining to his termination from employment with Montgomery County.  (J.A. 2250–56.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); Levy v. Sterling Holding Co., 544 F.3d 493, 501 (3d Cir. 2008).

Only a factual dispute that is both genuine and material will defeat a motion for summary

judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute

is "genuine" if the evidence is such that a reasonable jury could possibly return a verdict for the

non-movant.  See id.  A dispute is "material" if it would affect the outcome of the case under

governing substantive law.  Id.

The moving party bears the initial burden to demonstrate that there are no facts on record

that support the non-moving party's position. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). If the moving party carries this burden, the non-moving party must then present specific facts showing the existence of a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). At this stage, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita, 475 U.S. at 586-87 (1986)). The non-moving party must set forth specific facts that show a genuine issue for trial and cannot rest upon the mere allegations or denials of its pleadings. Marten v. Godwin, 499 F.3d 290, 294-95 (3d Cir. 2007).

At the summary judgment stage, the court must construe the facts and inferences in the light most favorable to the non-movant. See Matsushita, 475 U.S. at 587; Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial questions." Stewart v. Rutgers, The State Univ., 120 F.3d 426, 431 (3d Cir. 1997) (quoting Robinson v. PPG Indust., Inc., 23 F.3d 1159, 1162 (7th Cir. 1994)).

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.   Count I: Title VII - Race Discrimination

In Count I of his First Amended Complaint (Doc. 4) (hereinafter "Complaint" and hereinafter cited as "Pl.'s Compl."), Plaintiff brings a claim for race discrimination against

10

Defendant Montgomery County.[9]  (Pl.'s Compl. 9-10.)  Defendant moves for summary judgment on Plaintiff's claim, arguing that Plaintiff has failed to set forth sufficient evidence to sustain his claim under Title VII.  (Defs.' Mot. 14.)

The parties agree that the burden-shifting framework, outlined by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to Plaintiff's disparate treatment race discrimination claim brought under Title VII.  Under McDonnell Douglas, the Court's analysis consists of three steps.  First, the plaintiff must establish a prima facie case of discrimination.  Id. at 802.  To establish a prima facie case of race discrimination under Title VII, a plaintiff must show (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was discharged "under conditions that give rise to an inference of unlawful discrimination."  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); see also McDonnell Douglas, 411 U.S. at 802.  The plaintiff has a low bar for establishing his prima facie case in an employment discrimination suit.  Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006).

If the plaintiff successfully establishes his prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection," or in this case, termination.  McDonnell Douglas, 411 U.S. at 802.  This burden is a relatively light one.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Once the defendant carries this burden, the burden then shifts back to the plaintiff to point

---

[9] Montgomery County will be referred to as "Defendant" for the remainder of the analysis pertaining to Plaintiff's Title VII claims.

to evidence from which the finder of fact could reasonably conclude that Defendants' proffered reasons are pre-textual for prohibited discrimination. Fuentes, 32 F.3d at 763. Plaintiff can satisfy his burden by producing evidence from which a factfinder could reasonably either (1) disbelieve the Defendants' articulated reasons or (2) believe that a discriminatory reason was more likely than not a motivating or determinative factor behind the employer's action. Id. at 764. Evidence discrediting a defendant employer's reason must contradict "the *core facts* put forward by the employer as the legitimate reason for its decision." Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (emphasis added). Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765 (internal quotations and citations omitted). Plaintiff is not required to discredit *all* of Defendant's proffered reasons; if he can cast "substantial doubt" on a "fair number of them," he may undermine the Defendant's credibility such that he need not discredit the remaining reasons. Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006) (citing Fuentes, 32 F.3d at 764 n.7).

Ultimately, although the burden of production shifts between the plaintiff and defendant in this analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 252-53.

### (1) *Termination*

Plaintiff alleges that Defendant Montgomery County unlawfully terminated Plaintiff

because of his race.[10] (Pl.'s Compl. 10 ¶ 39.) Defendant does not dispute that Plaintiff has

satisfied the first three elements of his prima facie case relating to this particular claim. (See

Defs.' Mot. 14-27.) Defendant disputes, however, that Plaintiff has proffered evidence to satisfy

the fourth element of his prima facie case: that Plaintiff was terminated under circumstances that

give rise to an inference of unlawful discrimination. (Id.)

A plaintiff may satisfy the fourth element of his prima facie case by demonstrating that

the employer treated a similarly-situated employee,[11] who is not in the protected class, differently

than the plaintiff was treated. Senador v. Zober Indus., No. 07-4144, 2009 WL 1152168, at *4

(E.D. Pa. Apr. 28, 2009) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir.

1999)). Here, to show that he was treated differently, a plaintiff must "set forth evidence to

establish that he was treated differently from his Caucasian co-workers for similar disciplinary

infractions." Nicholson v. Bradley Graphic Solutions, Inc., No. 03-2151, 2004 WL 870692, at *4

(E.D. Pa. Apr. 22, 2004) (quoting Davis v. City of Phila. Water Dep't, No. 00-5671, 2001 WL

1390750, at *3 (E.D. Pa. Nov. 7, 2001)). Because a plaintiff may be unlawfully discriminated

---

[10] Count I of Plaintiff's Complaint reads, in relevant part, "Montgomery County in
violation of Title VII . . . denied Plaintiff equal employment opportunities because of race, and it
retaliated against Plaintiff because of his opposition to racially based employment
discrimination." (Pl.'s Compl. 10 ¶ 39.) Plaintiff incorporates under Count I paragraphs one to
thirty-six of his Complaint. (Pl.'s Compl. 9.) Earlier in his Complaint, Plaintiff states that after
he filed discrimination charges against the County with the PHRC, he "was immediately
subjected to intensified acts of discrimination, retaliation for filing a PHRC Complaint against
Montgomery County, which retaliation included being terminated by Defendants County,
Commissioners, and District Attorney Ferman." (Id. at 7 ¶ 26.) As it is interpreted in both
Defendants' Motion and Plaintiff's Response, the Court construes Plaintiff as alleging in Count I
that his termination was an act of unlawful discrimination by the County.

[11] To be considered a similarly-situated employee, that employee must share "all relevant
aspects of employment" with the plaintiff. McCullers v. Chertoff, No. 07-4187, 2010 WL
99378, at *6 (E.D. Pa. Jan. 11, 2010).

against without a similarly-situated individual being treated differently, the plaintiff may alternatively satisfy the fourth element of his prima facie case by demonstrating a "causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent." Anderson v. Wachovia Mortgage Corp., 621 F.3d 261, 275 (3d Cir. 2010); see also Dellapenna v. Tredyffrin/Easttown Sch. Dist., No. 09-6110, 2011 WL 130156, at *6 (E.D. Pa. Jan. 13, 2011).

To show an inference of unlawful discrimination on the part of Defendant, Plaintiff points to other county detectives who were allegedly treated more favorably than Plaintiff by the County and County officers when issues of job performance arose. Specifically, Plaintiff alleges that these detectives were offered an opportunity to resign before being terminated, whereas Plaintiff was not given the option to voluntarily resign. (Pl.'s Resp. 32-35; Pl.'s Facts 9-10.)

First, Plaintiff cites to former Montgomery County detective Robert Fasold, a white male, who was eventually terminated by former District Attorney Bruce Castor for poor job performance. (Pl.'s Facts 9; J.A. 2671.) Before his termination, Mr. Fasold was offered the opportunity to voluntarily resign his position, rather than be terminated. If he agreed to resign, Mr. Fasold was to be transferred to another unit within the Detective Bureau and given flexible hours during which he could search for other employment. (J.A. 1291, 2670.) Only when Mr. Fasold refused to voluntarily resign was he terminated by former District Attorney Bruce Castor. (J.A. 1291, 2671.)

Second, Plaintiff offers former detective Dave Evans as a similarly-situated employee, not in Plaintiff's protected class, who was treated differently. Mr. Evans, a white male, was

14

offered the opportunity to resign after it was discovered that Mr. Evans failed to properly document gambling buy money.[12] (Defs.' Mot. 24; J.A. 226, 762, 862-64.)

Defendant argues that neither Mr. Fasold nor Mr. Evans can be considered similarly-situated employees, because the acts they committed that allegedly led to their termination were not "as egregious as those of [Plaintiff]." (Defs.' Mot. 24.) Interpreting the facts in the light most favorable to Plaintiff, however, the Court finds that in all three cases – Mr. Fasold's, Mr. Evans's, and Plaintiff's – the basis for separation can be characterized loosely as "performance issues," which are all grounded, at least in part, in violations of existing policies of the District Attorney's office or orders of supervisors.[13] Accordingly, the Court will consider Mr. Fasold and Mr. Evans to be similarly-situated employees. In that Defendant concedes that Mr. Fasold and Mr. Evans were both given the opportunity to resign, (see Defs.' Mot. 24), there is sufficient evidence of unequal treatment between Plaintiff and similarly-situated employees not in Plaintiff's protected class to satisfy the fourth element of Plaintiff's prima facie case.

---

[12] Plaintiff also cites Jarrod Geistorfer as a relevant comparator; however, Geistorfer was not an employee of the District Attorney's office, but rather was on loan from another police department. (J.A. 237-38.) Therefore, the Court does not consider Geistorfer to be a similarly-situated employee for purposes of Plaintiff's prima facie case.

[13] Mr. Fasold was fired after going home instead of following an order to execute a search warrant immediately, which resulted in money being taken from a safe deposit box rather than forfeited to the County. (Defs.' Mot. 24; J.A. 1284 ("It was reported to me [former District Attorney Bruce Castor] that Detective Fasold left his post and did not carry out an order to conduct the search . . . in a timely fashion").) Mr. Evans was asked to resign for failure to document gambling buy money, (Defs.' Mot. 24), and because he was "sloppy" with handling evidence, including money, drugs, and other general evidence, (J.A. 763; see also J.A. 707-10 (outlining the County Detectives' procedure for handling evidence)). Defendants represent that Plaintiff was terminated "for violating the confidentiality policy of the District Attorney's Office and showing incredibly poor judgment." (Defs.' Facts 28 ¶ 200.)

Since Plaintiff has satisfied his initial burden, Defendant must show a legitimate, non-discriminatory reason for Plaintiff's termination. Defendant has satisfied this burden by asserting, among other reasons, that it terminated Plaintiff because he violated the confidentiality of the NET office by taking photographs of the inside of the NET House and sharing those photographs with the community.[14] (Defs.' Mot. 25; Defs.' Facts 28; J.A. 207-08.) Defendant also represents that Plaintiff was fired for "showing incredibly poor judgment," (Defs.' Facts 28 ¶ 200), for poor working habits, and for multiple performance issues, (J.A. 356).

Defendant has satisfied its burden; therefore, the burden shifts back to Plaintiff to point to evidence from which the finder of fact could reasonably conclude that Defendant's proffered reasons are pretextual for prohibited discrimination. Plaintiff has offered evidence to discredit Defendant's proffered reasons and raised genuine issues of material fact regarding Defendant's reason for Plaintiff's termination. First, numerous triable issues of fact surround Plaintiff's violation of NET's confidentiality and Defendant's motivation to fire Plaintiff for this reason. The parties dispute how many photographs were taken, whether any confidential information was revealed in those photographs, and whether Plaintiff represented or fostered the belief that the pictures revealed confidential information. Further, although Ms. Ferman knew of the photographs by June 2008, (J.A. 2199-2201), Plaintiff was not fired until August 2008. (J.A. 2183.) Second, Plaintiff's previous performance raises issues of fact regarding Defendant's motivation to fire Plaintiff. Before Lieutenant Forzato became Plaintiff's boss in January 2007, Plaintiff's annual evaluations consistently reflected strong performance. (J.A. 1743-59.) In

---

[14] Plaintiff does not deny that he took the photographs or that he showed copies of these photographs to individuals outside of the law enforcement community. (J.A. 56-58.)

addition, a chart prepared by Lieutenant Forzato to assess the performance of NET employees shows that there were several employees who were lower performers than Plaintiff in some categories. (J.A. 844-45, 2315.)

Plaintiff has raised significant questions relating to the material facts that underlie Defendant's articulated reasons for Plaintiff's termination; Plaintiff has thus raised a genuine issue of material fact as to whether Defendant's articulated reasons are merely pretext for unlawful discrimination. Defendants' motion is denied as to Plaintiff's claim of race discrimination on the issue of Plaintiff's termination.

### (2) *Decision not to pay Heart and Lung Act benefits and/or provide a hearing*

Plaintiff also alleges that Defendant Montgomery County unlawfully discriminated against him because of his race in its administration of his claim for Heart and Lung Act benefits. (Pl.'s Compl. 3-4 ¶ 10(g).) Defendant disputes that Plaintiff was ever denied such benefits. (Defs.' Mot. 21-22.) In support of its position, Defendant points to the testimony of Plaintiff's prior counsel, Blake Dunbar, who stated that the County never denied Plaintiff benefits after Mr. Dunbar became involved with the case.[15]  (J.A. 976.)

Taking the facts in a light most favorable to Plaintiff, Plaintiff has satisfied the elements of his prima facie case or has, at least, established genuine issues of material fact that must be resolved by a jury. There is no dispute that Plaintiff is a member of a protected class and was qualified for his position. As to the third element, Plaintiff has provided sufficient evidence at

---

[15] However, Dunbar also testified "[i]f the claim is not being paid, if it's denied, the claimant has the right to a local agency hearing of some type." (J.A. 977.)

this stage that the denial of Heart and Lung Act benefits, even assuming the denial was only

temporary, was an adverse action.[16] As to the fourth element of his prima facie case, Plaintiff

points to evidence of two white males, one County Detective and a County Sheriff, who were

paid benefits.[17] (Pl.'s Resp. 29-31.)  Plaintiff cites to testimony that the County Detective was

paid full salary and benefits, without a hearing or without a request for additional medical

records, after suffering a heart attack at home in his bed, an injury that does not generally qualify

for Heart and Lung Act benefits.  (J.A. 2878-79, 2883-85, 2887, 2903.)  Plaintiff also references

a County Sheriff as a second similarly-situated employee who was paid benefits.  But human

resources employee Toni Luter testified that although she knew the benefits were paid, she did

not know whether a hearing took place in order to "get the claim paid." (J.A. 2879.)

Nevertheless, Plaintiff has satisfied the fourth element of his prima facie case by providing

evidence of at least one similarly-situated employee, not in his protected class, who was treated

differently.[18]

---

[16] For an action taken by an employer to be considered an adverse action, it must be one that would dissuade a reasonable worker from exercising his rights to make or support a charge of discrimination. Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006).

[17] Plaintiff alleges there "are at least three White Males who sought Heart & Lung benefits; two are before Roberts [sic] claim and one after." (Pl.'s Resp. 29.)  Plaintiff states that the two white males who received benefits before Roberts were County Detective Timothy Dunleavy and a County Sheriff. (Id.)  In support of this contention, Plaintiff cites to the deposition of Montgomery County Human Resources employee Toni Luter.  However, Ms. Luter states in her deposition that the Sheriff's claim took place after Plaintiff's. (J.A. 2879, 2887.)  And Plaintiff does not discuss a third individual in his response.  Accordingly, the Court examines only the two similarly-situated employees clearly identified by Plaintiff in his response.

[18] The Third Circuit has noted that "the mere favorable treatment of one [member of a non-protected class] as compared to one [member of a protected class] may not be sufficient to infer . . . discrimination." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d

Defendant maintains that Heart and Lung Act benefits were never denied and that the

settlement, which is disputed by Plaintiff, of Plaintiff's Heart and Lung Act claim renders

Plaintiff's claim of discrimination moot as to this issue.  As a result, Defendant has not

specifically addressed its legitimate, non-discriminatory reason for withholding payment of

Plaintiff's benefits in its brief.  Defendant's motion for summary judgment on Plaintiff's claim of

discrimination for denial of Heart and Lung benefits is therefore denied.[19]

## B.  Count I: Title VII - Retaliation

In Count I of his Complaint, Plaintiff also brings a claim for retaliation against Defendant

Montgomery County.  (Pl.'s Compl. 9-10.)  Defendant denies that Plaintiff has produced

sufficient evidence of retaliation to survive summary judgment.  (Defs.' Mot. 29.)

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that

(1) he was engaged in protected activity; (2) the employer took an adverse action against the

---

Cir. 1998).  In Simpson, the Court cautioned that a Plaintiff cannot "selectively choose a
comparator" and cautioned that an African-American plaintiff cannot establish racial
discrimination by singling out one Caucasian similarly-situated employee who was treated more
favorably when there were other Caucasian persons treated less favorably.  See id. at 645-46
(citing Bush v. Commonwealth Edison Co., 990 F.2d 928, 931 (7th Cir. 1993)).  However, the
Third Circuit also noted that a court must view the record as a whole, and that evidence of
favorable treatment of a single member of a non-protected group can be relevant and may be
sufficient to permit an inference of discrimination at the prima facie stage of the analysis.  Id.

[19] To the extent that Plaintiff's Complaint makes additional allegations of discrimination,
Plaintiff has not provided any factual or legal support for these allegations in his response to
Defendants' motion.  Instead, Plaintiff's response focuses on Defendant's actions related to
Plaintiff's termination and its administration of Plaintiff's Heart and Lung Act claim.  In
addition, as Plaintiff notes in his Complaint, many of the alleged actions of discrimination lie
outside the statute of limitations.  Accordingly, the Court construes Plaintiff's response to
indicate that Plaintiff is pursuing only those discrimination claims addressed above.

plaintiff subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the adverse employment action. Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006); Woodson v. Scott Paper Co.,109 F.3d 913, 920 (3d Cir. 1997). If the plaintiff establishes his prima facie case, the McDonnell Douglas burden shifting approach applies and the burden of production shifts back to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. Once the employer meets this relatively light burden, the burden shifts back again to the plaintiff to establish that the employer's proffered reason is pre-textual for discrimination. McDonnell Douglas, 411 U.S. at 804-05.

Defendant does not contest that Plaintiff engaged in a protected activity,[20] and the Court finds that Plaintiff engaged in protected activity when he filed a Complaint with the PHRC on May 14, 2008, (J.A. 70, 2003-12), participated in the investigation, and testified at the PHRC fact-finding conference on August 7, 2008, (see J.A. 433). See 42 U.S.C. § 2000e. Plaintiff's letter to Ms. Ferman and other County supervisors stating that he found materials on the NET House refrigerator to be racially offensive also consisted of protected activity (J.A. 70, 1991-92). See also Moore, 461 F.3d at 343 (holding that informal protests of discriminatory practice, including making complaints to management, can be considered "opposition" to discrimination for purposes of Title VII).

Defendant also does not contest that Plaintiff's termination was an adverse action that

---

[20] The anti-retaliation provision of Title VII protects individuals who participate in various Title VII proceedings and those who oppose unlawful discrimination. Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006). Although Defendant cites to a number of cases holding that the respective plaintiffs did not engage in a protected activity, Defendants do not appear to argue that Plaintiff's activities in this case should not be considered protected activities by the Court.

was taken against Plaintiff subsequent to his filing a complaint with the PHRC and delivering the letter to Ms. Ferman.[21] (See Defs.' Mot. 27-29.) Defendants do, however, dispute that a causal connection existed between Plaintiff's protected activity and his termination from employment. (Defs.' Mot. 28-29.)

When evaluating whether a causal connection existed, the Third Circuit looks to whether a reasonable jury could connect the employer's conduct to a retaliatory animus. In making this assessment, courts often focus on two factors: (1) the temporal proximity between a plaintiff's engagement in a protected activity and the employer's adverse action in question, and (2) the existence of "a pattern of antagonism in the intervening period." See Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir.2001) (quoting Woodson, 109 F.3d at 920-21). The causation analysis, however, "necessarily involves an inquiry into the motives of an employer" and is "highly context-specific." Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997). Temporal proximity alone, when unusually suggestive, may be sufficient to establish causation between the protected activity and the adverse employment

---

[21] Plaintiff's brief clarifies the scope of his activities allegedly protected by Title VII: (1) filing a charge of employment discrimination, which occurred in May 2008; (2) cooperating in the investigation of the charge by the PHRC, which took place after the charge was filed; and (3) opposing employment discrimination by making a complaint to his employer, which occurred in May or June 2008. (Pl.'s Resp. 44.) Plaintiff's brief also clarifies the adverse actions he alleges to have suffered. Specifically, Plaintiff contends that in addition to his termination, he suffered adverse actions in retaliation for said protected activities that included his forced transfer from NET, which occurred in April 2008 and the denial of a start time change by Chief Vance and Lieutenant Bernstiel, the timing of which is unclear from Plaintiff's citations to the record on this point. (Pl.'s Resp. 44-45; see Doc. 115, at 6.) As noted above, to be considered retaliatory, the adverse action alleged must be contemporaneous with or subsequent to a plaintiff's protected activity. Only Plaintiff's termination meets this criterion. Therefore, the Court's analysis of Plaintiff's claim for retaliation pursuant to Title VII is limited to the Defendant's allegedly retaliatory termination of Plaintiff.

action.  Shellenberger v. Summit Bancorp Inc., 318 F.3d 183, 189 (3d Cir. 2003).

In this case, the evidence of causation is sufficient to allow a jury to connect Plaintiff's protected activity with his subsequent termination.  Plaintiff's termination took place only one day after Plaintiff testified at the PHRC fact-finding conference, and less than three months after he filed his original PHRC complaint.  In addition, Plaintiff's termination occurred approximately two months after Ms. Ferman and other Montgomery County supervisors received Plaintiff's internal complaint about materials he viewed as racially offensive.

Since Plaintiff has produced evidence to satisfy his prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. McDonnell Douglas Corp., 411 U.S. at 802.  As discussed earlier in the context of Plaintiff's discrimination claim, Defendant has satisfied this burden, shifting the burden back to the Plaintiff to show pretext.  And as noted above, Plaintiff has raised genuine issues of material fact with respect to the facts underlying Defendants articulated reasons for terminating Plaintiff. Therefore, Defendants' motion is denied with respect to Plaintiff's claim for retaliation in violation of Title VII.

## C.   Count II: 42 U.S.C. § 1983 - Retaliation for First Amendment Activities

Plaintiff also brings a claim under 42 U.S.C. § 1983 against Defendants Risa Ferman, Oscar Vance, Samuel Gallen, Edmund Justice, Mark Bernstiel, and Stephen Forzato for retaliation against Plaintiff for activities protected by the First Amendment's Free Speech and

Petition Clauses.[22] (Pl.'s Compl. 10-11.) Plaintiff contends that Defendants retaliated against him because of the following First Amendment activities: (1) filing for benefits under the Heart and Lung Act; (2) filing employment discrimination charges; (3) testifying at a fact-finding conference before the PHRC; (4) speaking out about dangerous work conditions to his supervisors and the NET House landlord; and (5) filing for Worker's Compensation benefits.[23] (Pl.'s Compl. 10-11; Pl.'s Resp. 51.) Plaintiff further alleges that Defendants took the following actions to retaliate against Plaintiff for his protected activity: (1) denying Plaintiff's Heart and Lung benefits; (2) denying him process to obtain various benefits; (3) causing him to work in a dangerous environment; (4) terminating him; and (5) forcing him to transfer to another unit without providing an opportunity to challenge the transfer. (Pl.'s Compl. 11.) Defendants move for summary judgment on Plaintiff's First Amendment claim on the grounds that Plaintiff has not established that his speech was a matter of public concern and was not, therefore, protected by the First Amendment. (Defs.' Mot. 54.)

---

[22] The remaining individual defendants listed under Count II were dismissed from this case on February 23, 2010 (Doc. 12).

[23] Plaintiff does not specifically list his fourth or fifth activities, speaking out about dangerous work conditions and filing for Worker's Compensation, under Count II of his Complaint. Under Count II, however, Plaintiff raises the issue of Heart and Lung Act benefits and "other statutory health care and wage loss benefits." (Pl.'s Compl. 11 ¶ 43.) Further, in Count II, Plaintiff incorporates all preceding paragraphs of his Complaint. (Pl.'s Compl. 10 ¶ 41.) Plaintiff stated earlier in his Complaint that he "reported and repeatedly complained of the unhealthy work environment," (Pl.'s Compl. 4 ¶ 11), and that he "sought statutory [sic] entitled Heart & Lung Act benefits for the medical treatment and care of the fungus exposure and wage loss that resulted from the work environment air bourn [sic] pollutants, viz mold and fungus," (Pl.'s Compl. 5 ¶ 15). Plaintiff then lists these specific activities in his response to Defendants' motion. (See Pl.'s Resp. 50-51.) In that Defendants' Reply does not challenge Plaintiff's ability to introduce these additional factual allegations, the Court will consider whether Plaintiff's speech on these issues implicates the First Amendment.

To establish a claim under 42 U.S.C. § 1983, Plaintiff must demonstrate that a person acting under color of state law has violated a right protected by the Constitution or a law of the United States. Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000). It is undisputed that Defendants in this case acted under color of state law. Therefore, the Court must consider whether the relevant County employees in this case violated Plaintiff's rights guaranteed by the First Amendment of the Constitution.

To maintain a First Amendment retaliation claim, a plaintiff must establish that: (1) he engaged in an activity protected by the First Amendment; (2) the employer took a retaliatory action that was "sufficient to deter a person of ordinary firmness from exercising his constitutional rights"; and (3) there was a casual link between the protected conduct and the adverse action.[24] Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006). Even if the plaintiff is able to make such a showing, the employer may still rebut the claim by demonstrating, by a preponderance of the evidence, that it would have taken the same action even in the absence of the protected conduct. Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2005). Where a plaintiff brings his First Amendment retaliation claim against multiple defendants, the plaintiff must establish that each individual defendant participated in or approved of each of the alleged violations. See C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005).

(1) *Protected activity*

---

[24] The Third Circuit has also expressed a requirement at this stage that the plaintiff "must then show the protected activity was a substantial or motivating factor in the alleged retaliatory action." Baldassare v. State of N.J., 250 F.3d 188, 195 (3d Cir. 2001); Brennan v. Norton, 350 F.3d 399, 414 (3d Cir. 2003).

24

In this case, Plaintiff alleges his activities were protected by both the Free Speech and Petition Clauses of the First Amendment. (See Pl.'s Compl. 10-11; Pl.'s Resp. 50-52.) Under both clauses, for expression to be considered protected activity, a plaintiff must show: (1) that he spoke or petitioned as a citizen on a matter of public concern; and (2) that his First Amendment interest in expression is not outweighed by the government's countervailing interest in the "effective and efficient management of its internal affairs." Borough of Duryea, Pa. v. Guarnieri, 131 S. Ct. 2488, 2493, 2500 (2011).

Plaintiff alleges that speaking out to Lieutenant Forzato, other supervisors, and the NET House management company about the dangerous work conditions at the NET House constitutes speech protected by the First Amendment Free Speech Clause. (See Pl.'s Resp. 51.) Plaintiff also alleges that his testimony at the PHRC fact-finding conference in August 2008 was protected speech. (Pl.'s Compl. 11.) Plaintiff further contends that the following actions were protected under the First Amendment Petition Clause: (1) filing for benefits under the Heart and Lung Act, (2) filing for Worker's Compensation benefits; and (3) filing employment discrimination charges with the PHRC. (Pl.'s Compl. 10-11; Pl.'s Resp. 51.)

Whether an employee's speech addresses a matter of public concern is a question of law to be resolved by the Court, and "must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-148 (1983). An employee's speech is considered a matter of public concern when it can be "fairly considered" to relate to "any matter of political, social, or other concern to the community." Watters v. City of Phila., 55 F.3d 886, 892 (3d Cir. 1995). In other words, public speech cannot constitute merely personal grievances. Brennan v. Norton, 350 F.3d 399, 412 (3d Cir. 2003).

25

Nevertheless, speech that is motivated by private concern may still qualify as protected speech. Id. at 412. The speaker's motive, while relevant, is not dispositive in determining whether speech relates to a matter of public concern. Id. at 413.

As an initial matter, viewing the facts in a light most favorable to Plaintiff, Plaintiff's speech about the conditions of the NET House is a matter of public concern. The Third Circuit held in Brennan that a firefighter's speech regarding asbestos in the fire stations was a matter of public concern. Id. at 414-16. The Court reasoned the public had an interest in knowing that their tax dollars were being spent on a firestation that was contaminated and endangering the lives of public employees who were committed to protecting the township's citizens from danger. Id. at 415. The same logic applies in this case. Although Plaintiff does not argue that the conditions of the NET House violated state safety standards, as the plaintiff argued in Brennan, the presence of mold at the NET House may have endangered the health and safety of the County detectives working there. Accordingly, Plaintiff's speech on this issue is a matter of public concern.

Taking the facts in a light most favorable to Plaintiff, the record as a whole shows that Plaintiff's filing of employment discrimination charges with the PHRC and testifying at the PHRC fact-finding conference are also matters of public concern. As to the content of this expression, Plaintiff's employment discrimination charges, filed with the PHRC on May 14, 2008, contain serious allegations of long-term disparities in discipline and other treatment between Plaintiff, as the sole African-American County detective, and other Caucasian and Hispanic Detectives. (J.A. 2003-2012.) Although Plaintiff's motivations for filing such a charge may have been grounded in his own private interest, expression highlighting unfair

26

discrimination on the part of government officials is not devoid of public concern. Speech attempting "to bring to light actual or potential wrongdoing . . . on the part of government officials" may involve matters of public concern. Baldassare v. State of N.J., 250 F.3d 188, 195 (3d. Cir. 2001) (quoting Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993)). Likewise, Plaintiff's testimony on the same issues also touches on matters of public concern.

The form and context of Plaintiff's speech and petition related to discrimination charges further support the conclusion that both address matters of public concern. Filing formal charges with the state of Pennsylvania is among the most formal methods of speech. Likewise, the nature of a PHRC fact-finding conference implicates public concern. See Baldassare, 250 F.3d at 195-97 (holding that a plaintiff's conduct and expression in an internal investigation of other officers at a prosecutor's office was considered a matter of public concern); Pro v. Donatucci, 81 F.3d 1283, 1290-91 n.4 (3d Cir. 1996) (agreeing with a Fifth Circuit holding that found "[w]hen an employee testifies before an official government adjudicatory or fact-finding body he speaks in a context that is inherently of public concern"); Green v. Phila. Housing Authority, 105 F.3d 882, 887 (3d Cir. 1997) (extending Baldassare and Pro to apply in cases where a witness appears voluntarily at a court proceeding). Plaintiff's allegations of discrimination and retaliation ultimately drew the attention of local media and the local chapter of the National Association for the Advancement of Colored People. (See, e.g., J.A. 2257, 2259-60, 2696.)

The same conclusion cannot be reached with regard to Plaintiff's filing for Heart and Lung Act benefits and Worker's Compensation benefits. Nothing about the content, form, or context of Plaintiff's filing for these benefits suggest that Plaintiff was attempting to exercise his right "to participate as a citizen, through petitioning activity, in the democratic process."

27

Guarnieri, 131 S. Ct. at 2501.  Rather, Plaintiff was simply attempting to collect the benefits that

he believed he was due, as an employee of the County, in order to pay his medical bills and costs

of daily living while he was out of work on sick leave.  His applications, which provided medical

information otherwise kept confidential, clearly did "not seek to communicate to the public or to

advance a political or social point of view."  Id.  Therefore, Plaintiff's claims for First

Amendment retaliation will not advance on the basis of these two activities.

Once a plaintiff establishes that his speech was a matter of public concern, the plaintiff

must then "demonstrate his interest in the speech outweighs the state's countervailing interest as

an employer in promoting the efficiency of the public services it provides through its

employees."  Baldassare, 250 F.3d at 195.  This inquiry is also a legal one to be decided by the

Court.  Brennan, 350 F.3d at 413.  In making this determination, the Court must consider the

nature of the relationship between the employee and the disruption caused by the employee's

speech, "including the impact of the speech on the employer's ability to maintain discipline and

relationships in the workplace."  Id.

Arguing that Plaintiff's speech was not a matter of public concern, Defendants have not

addressed whether Plaintiff's interest in the speech outweighs the County's interest in promoting

efficiency.  (See Defs.' Mot. 53-55; see also Defs.' Reply.)  Plaintiff also does not directly

address this inquiry.  (See Pl.'s Resp. 50-52.)  Nevertheless, the record before the Court indicates

that Plaintiff's speech and filing of discrimination charges did not disrupt the workplace in a

meaningful way.  Defendants do not argue, nor does the record clearly reflect, that Plaintiff's

reporting of poor working conditions at the NET House affected the ability of NET to continue

providing services to the community in any way.  Likewise, although Plaintiff's charges required

some attention from County officials, they did not appear to lead to discord among other employees or impact the ability of NET supervisors to maintain order and discipline at NET. For these reasons, Plaintiff has satisfied his burden as to the first element of his First Amendment retaliation claim, but only insofar as it relates to Plaintiff's (1) speaking out about dangerous conditions in the workplace; (2) filing charges with the PHRC; and (3) testifying at a PHRC fact-finding conference.

### (2) *Adverse action*

Having satisfied the first element of his First Amendment retaliation claim, that he engaged in a protected activity, Plaintiff must show the alleged retaliatory actions against him rise to the level of constitutional violations. Thomas, 463 F.3d at 296. As noted above, Plaintiff alleges in his Complaint that Defendants took the following adverse actions against him in retaliation for his First Amendment activities: (1) denying Plaintiff Heart and Lung benefits; (2) denying him process to obtain various benefits; (3) causing him to work in a dangerous environment; (4) terminating him; and (5) forcing him to transfer to another unit without providing an opportunity to challenge the transfer. (Pl.'s Compl. 11.)

For an action to be considered as adversely affecting an employee's First Amendment rights, that action must be more than *de minimus* or trivial. Brennan, 350 F.3d at 419. The alleged retaliatory conduct must be "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (citations omitted). "A public employer adversely effects an employee's First Amendment rights . . . when it makes decisions, which relate to promotion, transfer, recall and hiring, based on the

exercise of an employee's First Amendment rights." Brennan, 350 F.3d at 419 (quoting Suarez
Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)).  "On the other hand, courts have
declined to find that an employer's actions have adversely affected an employee's exercise of his
First Amendment rights where the employer's allegedly retaliatory acts were criticism, false
accusations, or verbal reprimands." Id.

Viewing the facts in the light most favorable to Plaintiff, the retaliatory actions alleged by
Plaintiff could rise to the level of First Amendment violations if proven, particularly when
viewed in context with the entire course of conduct that Plaintiff has alleged.  For instance, there
is no question that Plaintiff's termination could support claim for illegal retaliation under § 1983.
However, even though a number of Plaintiff's allegations could support a claim for First
Amendment retaliation, the record indicates that the individuals responsible for those actions are
not defendants in this case.  These allegations will be analyzed further below.

As noted, where a plaintiff brings his First Amendment retaliation claims against multiple
defendants, the plaintiff must establish that each *individual defendant* participated or acquiesced
in each of the alleged violations.  See C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d
Cir. 2005) (emphasis added).  Since Plaintiff has not articulated with precision which Defendants
he claims were responsible for the retaliatory actions alleged, such a determination will be made
based on the record.

(a) Denial of Heart and Lung Act benefits

Plaintiff claims that the decision of County personnel to deny him benefits under the
Heart and Lung Act was an adverse action against him.  (Pl.'s Compl. 11.)  Plaintiff's former

attorney, Blake Dunbar, testified that Plaintiff was never given a "final denial" of Heart and Lung benefits. (J.A. 976-77, 984-85.)  Mr. Dunbar testified that Plaintiff was given a denial pending receipt of additional information; Plaintiff was simply told that he needed to submit additional medical information so County personnel could assess whether or not Plaintiff qualified for benefits under the Act.  (Id.)  Peter Leis, the director of human resources for Montgomery County at the relevant time, wrote to Plaintiff on February 26, 2008, that the County was unable to grant benefits under the Heart and Lung Act "at this time" and that the request would be reviewed when more information was received.  (J.A. 1875.)

The Office of the Solicitor, and specifically former Chief Deputy Solicitor Carolyn Carluccio, eventually assumed oversight of Plaintiff's Heart and Lung Act claim and indicated by letter to Mr. Dunbar that the County still had not made a decision on the claim because it was in need of additional information from Plaintiff.  (J.A. 1889.)  Ms. Carluccio continued to correspond with Mr. Dunbar in June through October 2008.  (J.A. 1896-1906.)  In October 2008, County Solicitor Barry Miller also became involved in the decision process.  (J.A. 1916-18.) Risa Ferman provided her opinion that she believed Plaintiff *was* entitled to benefits, (J.A. 1916,) but also made clear that the decision was the responsibility of the County Solicitor's office.  (J.A. 1916, 1920.)  Similarly, Chief Vance commented that his office never had any objections to Plaintiff receiving Heart and Lung benefits.  (J.A. 1916.)  Plaintiff has acknowledged that to date, he has received almost $37,000 in Heart and Lung Act benefits.  (J.A. 104.)

Regardless of whether Plaintiff is alleging that the retaliatory action against him was a temporary denial or a final denial of Heart and Lung Act benefits, Plaintiff does not attach responsibility for the *denial* of Heart and Lung Act benefits to any individual defendant

remaining in this suit. Further, review of the correspondence pertaining to Plaintiff's Heart and

Lung benefits reveals that officials in the County's human resources office and solicitor's office

were responsible for all decisions relating to those benefits. None of those officials remain

parties to this lawsuit.[25] Therefore, the denial of Heart and Lung benefits is not an action upon

which Plaintiff's First Amendment retaliation claim can be based.


(b) Denial of process to obtain Heart and Lung Act benefits

Plaintiff also alleges that County personnel took adverse action against him by "denying a

process to obtain Heart & Lung benefits or other statutory health care and wage loss benefits."

(Pl.'s Compl. 11.) As to Heart and Lung benefits, Plaintiff has not attached responsibility for the

denial of process related to said benefits to any of the individual defendants remaining in this

case. Plaintiff's Heart and Lung Act claim was processed and administered by the human

resources department and solicitor's office. Therefore, for the same reasons discussed above,

Plaintiff may not base his First Amendment retaliation claim on this action.

Plaintiff's claim can also not rest upon the denial of process for "other statutory health

care and wage loss benefits" to which Plaintiff may have been entitled. Plaintiff does not, in his

Complaint or summary judgment response, articulate with specificity the additional benefits for

---

[25] Although, as discussed below, several individual defendants were involved with the
NET House assessment for mold and other dangerous conditions, which may have related to
Heart and Lung Act benefits, the record indicates that Plaintiff's claim for those benefits did not
hinge on the outcome of any testing. Further, the County did not state that it required any
confirmation that the office condition could or did cause the illness alleged. Rather, the County
requested additional medical information regarding Plaintiff's diagnosis and requested that he
submit a return to work date. (See, e.g., J.A. 1869, 1875, 1889.)

which he was denied process.[26] In light of Plaintiff's reference to his Workers' Compensation claim in his summary judgment response, and giving Plaintiff the benefit of the doubt, it will be assumed that Plaintiff refers to the denial of Workers' Compensation benefits. Again, however, Plaintiff has not attached responsibility for the denial of those benefits to any of the individual defendants named in this case. Moreover, a review of the record, specifically that portion of the record Plaintiff highlights as relevant to the denial of Workers' Compensation benefits, (Pl.'s Facts 3 ¶¶ 19-20), indicates that individuals in the County's human resource department administered the Workers' Compensation claims of County employees. (J.A. 1851-68.)

### (c) Causing Plaintiff to work in a dangerous environment

Next, Plaintiff claims that County personnel took adverse action against him by causing Plaintiff to work in a dangerous environment. (Pl.'s Compl. 11.) Like his other allegations of adverse action, Plaintiff does not specify exactly which defendant was responsible for this particular adverse action. However, Plaintiff testified that he began complaining to Lieutenant Forzato in January 2007 about the condition of his office. (J.A. 39.) Correspondence via e-mail between Lieutenant Forzato and Deputy Chief Gallen, Chief Vance, and Risa Ferman reflects that all were somewhat involved with decisions surrounding the conditions at the NET House and relevant repairs. However, the involvement of Ms. Ferman, Chief Vance, and Deputy Chief Gallen seems to occur primarily after Plaintiff began his extended sick leave. (J.A. 1812-20.) The Court thus concludes that only Defendant Forzato participated in the decision to have

---

[26] While Plaintiff's Complaint mentions "black lung" benefits, (Pl.'s Compl. 3-4), he states in his response that he has never asserted such a claim. Therefore, the Court will not consider any allegation relating to black lung benefits.

33

Plaintiff continue working in the NET House after Plaintiff complained to him, but before Plaintiff began his sick leave and the problems were subsequently remedied.

### (d) Termination

Ms. Ferman testified that the ultimate decision to fire Plaintiff rested with her. (J.A. 146.) However, she also testified that Chief Vance and Deputy Chief Gallen contributed to her decision-making process and made recommendations to her that Plaintiff be fired. (E.g., J.A. 146, 218.) The Court thus concludes that Defendants Ferman, Vance, and Gallen participated in or acquiesced, at some level, to Plaintiff's termination.

### (e) Forced transfer to another unit

Plaintiff's final allegation of retaliatory action was that he was forced to transfer to another unit without having been provided an opportunity to challenge the transfer.[27] Chief Vance testified that he was responsible for the decision to transfer Plaintiff out of the NET House. (J.A. 448.) However, e-mail correspondence in the record also indicates that Lieutenant Forzato and Deputy Chief Samuel Gallen may have participated in the decision to transfer Plaintiff. (See J.A. 1806, 1810-11.) Taking the facts in a light most favorable to Plaintiff, the

---

[27] Plaintiff's Complaint, which lists the adverse actions to which he was subjected allegedly in violation of his First Amendment rights, reads as follows: "Defendants . . . subjected Plaintiff to adverse action that included, but is not limited to denying Heart & Lung benefits, denying a process to obtain Heart & Lung benefits or other statutory health care and wage loss benefits, causing him to work in a dangerous work environment, and terminating him; a forced transfer and Montgomery County Detectives Collective Bargaining Unit Agreement right to challenge the transfer and *start time for employees.*" (Pl.'s Compl. 11 ¶ 43 (emphasis added)). Plaintiff has not provided support in the record for any allegations relating to his start time, as the citations offered do not address such a change with any clarity. (See Doc. 115 at 6.)

Court concludes at this stage that Chief Vance, Lieutenant Forzato, and Deputy Chief Gallen participated in the decision to transfer Plaintiff out of NET.

In sum, Plaintiff may proceed to the third step of the First Amendment retaliation analysis based on the following allegedly retaliatory actions taken against him by individual defendants still named in this case: (1) causing him to work in a dangerous environment; (2) termination; and (3) forced transfer. The Court will thus analyze whether there is sufficient evidence to link these actions by Defendants Ferman, Vance, Gallen, and Forzato to Plaintiff's protected First Amendment activities.[28]

### (3) *Causation*

The third and final element Plaintiff must prove in a claim of First Amendment retaliation is that "the protected activity was a substantial or motivating factor in the alleged retaliatory action." Baldassare, 250 F.3d at 195. To find causation, Courts generally look to whether the plaintiff has shown either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[29] Pollock v. City of Phila., 403 Fed. Appx. 664, 668 (3d Cir. 2010)

---

[28] Plaintiff has not articulated a clear connection between Defendants Bernstiel and Justice and the allegedly retaliatory actions against him. Further, Plaintiff has offered no response to Defendants' contention in its Motion that claims be dismissed against these defendants for want of evidence of personal involvement. (Defs.' Mot. 52-52.) Because Plaintiff has presented insufficient evidence to suggest that Defendants Bernstiel and Justice participated in the aforementioned allegedly retaliatory activities, Plaintiff's First Amendment retaliation claims against these defendants are dismissed.

[29] The causation requirement for First Amendment retaliation claims, brought pursuant to § 1983, is identical to the causation requirement for Title VII claims. Brennan, 350 F.3d at 420.

(quoting Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)).  A plaintiff may also show a causal link by demonstrating that the record viewed as a whole supports this inference.  Id.

As outlined above, the Court construes Plaintiff's allegations to argue that Ms. Ferman retaliated against Plaintiff for First Amendment activities, by terminating Plaintiff.  For the same reasons discussed with respect to Plaintiff's Title VII retaliation claim, there is an unusually suggestive temporal proximity between Plaintiff's testimony at the PHRC fact-finding conference and his termination.  Therefore, Plaintiff has offered sufficient evidence to allow his First Amendment retaliation claim against Risa Ferman to proceed to a jury on the issue of Plaintiff's termination.

Also outlined above, the Court interprets Plaintiff's allegations to contend that Chief Vance and Deputy Chief Gallen retaliated against Plaintiff for First Amendment activities by participating in or acquiescing to Plaintiff's transfer from NET and his termination.  For the same reasons discussed with respect to allegations of retaliation by Ms. Ferman, the Court will allow Plaintiff's First Amendment claims against Chief Vance and Deputy Chief Gallen to proceed to a jury on the issue of Plaintiff's termination.

With respect to Plaintiff's transfer, specifically, the Court finds some evidence of temporal proximity between Plaintiff's ongoing complaints of the conditions at NET and Plaintiff's transfer from NET in April 2008.  More importantly, factual issues regarding the underlying reason for Plaintiff's transfer also indicate that antagonism toward Plaintiff may have been a factor in the decision to transfer.  When asked why he chose to transfer Plaintiff, Chief Vance stated that he made the transfer because Plaintiff's doctor advised Chief Vance that Plaintiff was not to remain in the NET House where the mold could continue to cause Plaintiff

36

difficulty. (J.A. 465.) But the Chief also stated that the mold had been removed prior to Plaintiff's transfer, (J.A. 581-82), and that the NET House no longer posed a danger to Plaintiff (J.A. 583-84). Finally, an e-mail sent by Deputy Chief Gallen in December 2007 indicates that Deputy Chief Gallen may have had an alternate reason for Plaintiff's transfer, other than to accommodate the request of Plaintiff's physician, which came some months later. (J.A. 1810.) Taking the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff's transfer could be considered adverse action for which Defendant Chief Vance and Deputy Chief Gallen were responsible.

According to Plaintiff, Lieutenant Forzato retaliated against Plaintiff's exercise of his First Amendment rights by participating in the decision to transfer Plaintiff and to have Plaintiff continue working in a dangerous environment. First, there is some level of temporal proximity between Plaintiff's First Amendment activities and the allegedly retaliatory actions in which Lieutenant Forzato participated. Plaintiff stated that he was not told to move offices throughout most of the course of 2007, despite complaining about the conditions of his office on an ongoing basis throughout 2007. Several e-mails sent by Lieutenant Forzato to other County officials demonstrate antagonism toward Plaintiff that could be connected with Plaintiff's First Amendment activities. For example, in a December 20, 2007 e-mail to Deputy Chief Gallen, Forzato wrote, "I will be asking you to transfer him out of [NET]. I do not want him around me or my unit while he is obviously preparing a lawsuit." (J.A. 1806.) The Court concludes that there is enough evidence to create genuine issues of material fact of a temporal relationship and a pattern of antagonism to preclude summary judgment for Lieutenant Forzato on Plaintiff's First Amendment retaliation claims.

37

In sum, the Court concludes that Plaintiff has raised genuine issues of material fact as to whether Plaintiff's protected activities were a substantial or motivating factor behind the alleged retaliatory actions by Defendants Ferman, Vance, Gallen, and Forzato.  Therefore, Defendants' motion as to Plaintiff's claims under 42 U.S.C. § 1983 for retaliation in violation of the First Amendment will be denied with respect to these individual defendants.

**D.  Count III: 42 U.S.C. § 1983 - <u>Monell</u> liability**

In Count III of his Complaint, Plaintiff asserts a claim against Montgomery County pursuant to § 1983 under <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658 (1978).  As noted above, a plaintiff bringing a claim pursuant to § 1983 must demonstrate that a person acting under the color of state law violated a right protected by the Constitution or federal law.  <u>Nicini</u>, 212 F.3d at 806.  When evaluating a Plaintiff's claim brought under § 1983, a Court must first "identify the exact contours of the underlying right said to have been violated" in order to determine "whether the plaintiff has alleged a deprivation of a constitutional right at all."  <u>Id.</u> "[I]n a <u>Monell</u> case, the 'proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and if so, (2) whether the [municipality] is responsible for that violation."  <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1149-50 (3d Cir. 1995) (quoting <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 120 (1992)).

In his Complaint, Plaintiff appears to allege that the County should be held liable for violations of Plaintiff's rights under Title VII, as well as under the Due Process Clause and Equal

Protection Clause of the United States Constitution.[30]   However, Plaintiff's brief appears to

narrow his claims of constitutional violations for which the County should be liable to a Due

Process Clause violation only.[31]   (See Pl.'s Resp. 59-64.)   Accordingly, the Court will address

whether Plaintiff has demonstrated a constitutional violation under the Due Process Clause for a

violation of his right to procedural due process with respect to his Heart and Lung Act claim.

According to the Third Circuit "a plaintiff . . . who seeks to establish a procedural due

process claim must demonstrate that '(1) he was deprived of an individual interest that is

encompassed within the Fourteenth Amendment's protection of life, liberty, or property,' and (2)

that the procedures available to him did not provide 'due process of law.'" Biliski v. Red Clay

Consolidated Sch. Dist. Bd. of Educ., 574 F.3d 214, 219 (3d Cir. 2009) (quoting Hill v. Borough

of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006)).   Defendant Montgomery County does not

appear to contest that benefits afforded under the Heart and Lung Act may be considered a

property interest for which due process is required under the Fourteenth Amendment or that

Defendant was entitled to receive Heart and Lung Act benefits.[32]   However, Defendants do

---

[30] Under Count III, Plaintiff begins by stating that "[t]he retaliation, discrimination against
the Plaintiff and denial of equal rights to state statutorily entitled benefits and due process by the
defendants was pursuant to an official policy and/or custom of Montgomery County." (Pl.'s
Compl. 12 ¶ 47.)

[31] Plaintiff's only heading in the section of his brief dedicated to Monell liability reads
"Montgomery County Has A Custom That Deprives A Due Process Hearing Right Through A
Deliberate Indifference To A Hearing And Heart & Lung Benefit Rights." (Pl.'s Resp. 61 (caps
in original)).

[32] Defendants do not specifically address Plaintiff's Due Process claim under their
analysis of Monell liability; however, Defendants do not contest that Heart and Lung benefits are
a protected property interest in relation to Plaintiff's § 1983 claim against individual defendants
for due process violations. (See Defs.' Mot. 36-42.)

challenge Plaintiff's contention that he was ever "denied" those benefits.  Defendants maintain

that they simply needed more information from Plaintiff in order to process his claim and grant

benefits.  In that Defendants believe that Plaintiff was never denied benefits, they do not appear

to dispute that Plaintiff was never given notice or a hearing.  See Cleveland Bd. of Educ. v.

Loudermill, 470 U.S. 532, 542 (1985) (quoting Mullane v. Central Hanover Bank & Trust Co.,

339 U.S. 306, 313 (1950)) (holding that "[a]n essential principle of due process is that a

deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing

appropriate to the nature of the case.'").

     Issues of material fact remain as to whether Plaintiff was ever denied Heart and Lung Act

benefits, to which Defendants have admitted Plaintiff was entitled, thus triggering the need for

procedures guaranteed by the Due Process Clause.  Plaintiff and Defendant fiercely dispute

whether Plaintiff was ever denied the benefits and how correspondence from the County should

be interpreted.  For instance, as noted above, the County's human resources director sent Plaintiff

a letter that stated "[a]t this time, we are not able to grant you benefits under the Heart & Lung

Act." (J.A. 1875.)  A reasonable jury could indeed construe this letter as denying Plaintiff

benefits.  Therefore, the Court will proceed to the second step of the Monell analysis and

determine whether, for purposes of § 1983, the actions of County employees can be attributed to

the County itself.

     In order for liability to be imposed upon a municipality under Monell, a plaintiff must

prove that: (1) the municipality had a policy or custom that deprived him of his constitutional

rights; (2) the municipality acted deliberately and was the moving force behind the deprivation;

and (3) the custom or policy in question caused his injury.  Bd. of the County Comm'rs of Bryan

County, Okla. v. Brown, 520 U.S. 397, 403-04 (1997). In other words, to establish the liability

of a municipality, a plaintiff must show that a policy or custom of that municipality resulted in a

constitutional violation. See Kelly v. Borough of Carlisle, 622 F.3d 248, 263 (3d Cir. 2010). A

"policy" is an official statement or proclamation made by an individual with the final authority to

make such a decision. Id. A "custom" is a well-settled practice of government officials that

virtually constitutes law, although the practice is not specifically authorized by a written law. Id.

Under Monell, there are a number of ways for a plaintiff to establish the existence of a

policy or custom that will be sufficient to impose liability on the municipality under § 1983.

Most obvious, a municipality will be bound by the actions of its legislative body. Pembaur v.

City of Cincinnati, 475 U.S. 469, 480 (1986). An official policy may also be found where a

municipal board or agency exercises authority granted by that municipality's legislative body.

See Monell, 436 U.S. at 694. Third, the actions taken by individuals who possess final authority

for making a particular decision in the municipality will be considered official policy under

§ 1983. Pembaur, 475 U.S. at 483. Fourth, a plaintiff may show that the municipality failed to

adequately train or supervise subordinates. City of Canton, Ohio v. Harris, 489 U.S. 378 (1989).

Plaintiff's Complaint does not clearly indicate under which theory Plaintiff intends to

proceed.[33] At oral argument, Plaintiff stated that he was proceeding under a theory that the

actions of both Solicitor Miller and District Attorney Ferman could be deemed County policy or

---

[33] Under Count III, Plaintiff's Complaint reads "The retaliation, discrimination against
Plaintiff and denial of equal rights to state statutorily entitled benefits and due process by the
defendants was pursuant to an official policy and/or custom of Montgomery County and/or its
Office of District Attorney, which policy is to: (a) fail to adequately train and supervise in race
discrimination, retaliation, in employment discrimination laws and/or to acquiesce and/or
condone and/or ratify to retaliate against those who engage in constitutionally protected activities
and/or who are subjected to discrimination because of race." (Pl.'s Compl. ¶ 47.)

custom. (Hr'g Tr. 74-75, 4/28/2011.)  Plaintiff's brief, however, focuses solely on the actions of

Solicitor Miller as the final authority with respect to Heart and Lung Act claims.  (See Pl.'s Resp.

59-64.)  Yet, Plaintiff's brief also discusses a failure to train and supervise employees.  (Id.)

Therefore, the Court will analyze Plaintiff's claim under both the third and fourth theories

discussed above.


### (1) *Actions taken by a policymaking official*

A municipality may not be held liable for the actions of its employees if that liability is

predicated on the theory of *respondeat superior.*  Monell, 436 U.S. at 691.  But a municipality

may be bound by the actions of an individual employee with final policy-making authority over a

particular decision when he himself acts or when he ratifies the unconstitutional actions of a

subordinate.  Hill, 455 F.3d at 245; see also McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir.

2005).  As an initial matter, the Court must first determine whether Barry Miller was a final

policymaker with respect to the administration of Plaintiff's Heart and Lung Act claim.

Whether an employee whose decisions are at issue is the final policy-maker is a question

of state law and requires a determination of the Court.  McGreevy, 413 F.3d at 368.  "In order to

ascertain who is a policymaker, a court must determine which official has final, unreviewable

discretion to make a decision or take action."  Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir.

1996) (internal quotations and citations omitted).  The Heart and Lung Act itself does not

designate a forum for applicants to adjudicate the denial of Heart and Lung benefits.  See, e.g.,

Wisniewski v. Workmen's Compensation Appeal Bd., 621 A.2d 1111, 1114 (Pa. Commw. Ct.

1993).

Solicitor Miller testified that the County Commissioners could have, hypothetically, overridden his decision on how to handle Plaintiff's claim and to ultimately grant Plaintiff benefits. (J.A. 1217-18.) However, he also testified that the Commissioners were not aware of Plaintiff's Heart and Lung claim and that he made the final decision to grant benefits, and it was followed. (J.A. 1218.) It appears that, as in McGreevy, the County Commissioners would have no input into the handling of an employee's Heart and Lung Act benefit claim absent an appeal of the denial of benefits. See McGreevy, 413 F.3d at 369. Viewing the facts in the light most favorable to Plaintiff, therefore, the Court concludes that Solicitor Miller had final authority over the administration of Plaintiff's Heart and Lung claim.

While Miller may be considered the final policy-making authority with regard to decisions to grant or deny Heart and Lung Act benefits, material factual issues remain as to when, how, and to what extent Miller became involved in the claim and whether Miller communicated approval to his subordinates, including Peter Leis and Carolyn Carluccio, who were involved with the alleged denial of the claim. For example, Solicitor Miller testified that he could not confirm when he first became aware of Plaintiff's claim. (J.A. 1531-32.) However, he did recall that Ms. Carluccio had already been involved with the claim when he started looking into it. (J.A. 1539.) Therefore, summary judgment is denied on this particular aspect of Plaintiff's municipal-liability claim.[34]

---

[34] As discussed, Plaintiff has received over $36,000 in due Heart and Lung Act benefits from Montgomery County. Plaintiff contends that he is still owed less than $2,000 in unpaid benefits, and he agreed to resolve any dispute as to his entitlement to the outstanding amount by a separate hearing before this Court. (See Hr'g Tr. 15-18, 9/9/10; Pl.'s Mot. Hr'g (Doc. 120).) Although, for purposes of the instant motion, the Court finds that material factual disputes preclude summary judgment as to this particular issue, Plaintiff's must demonstrate to the Court precisely what relief he seeks before he will be permitted to advance to trial on this claim.

43

(2) *Failure to train or supervise*

A municipality's failure to train or supervise its employees only gives rise to a constitutional violation when the failure amounts to deliberate indifference to the rights of individuals with whom those employees come into contact. See Harris, 489 U.S. at 388. The Third Circuit has stated that a plaintiff can only maintain a Monell claim resting on the theory of failure to train, discipline, or control if the plaintiff can demonstrate both "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." Montgomery v. De Simone, 159 F.3d 120, 127 (3d Cir. 1998) (citing Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir.1997)); see also Garcia v. County of Bucks, 155 F. Supp. 2d 259, 268 (E.D. Pa. 2001).

Plaintiff does not allege a prior pattern of similar conduct or incidents. In the absence of such a pattern, the Third Circuit has held that a plaintiff must demonstrate that the case falls within that "narrow range of circumstances" in which "a violation of federal rights may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." Brown, 520 U.S. at 409. In other words, without evidence of a pattern of violations, Plaintiff must show that in light of the duties of the County employees whose actions are at issue, "the need for more or different training is so obvious, and the inadequacy [of the employees' training is] so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." Harris, 489 U.S. at 396.

Plaintiff contends that the County should be held liable for the failure to supervise and

44

train employees "in the areas of Civil Rights, Due Process and/or Heart & Lung Law." (Pl.'s Resp. 61.) Plaintiff later restates his claim alleging that "the County failed to train and supervise its Solicitors and Human Resource Employees on its own procedures and the law." (Id. at 62.) However, he provides no additional detail as to the specific training or policies in these areas that he considers to be deficient. See De Simone, 159 F.3d at 127 (holding that the district court's grant of summary judgment was appropriate where plaintiff had "point[ed] to no inadequacy in [the defendant's] police training program" and "failed to allege any action or inaction by the municipal defendants that could be interpreted as encouraging [the defendant's] offensive actions"). In addition, Plaintiff has not pointed to any evidence that suggested such an omission in training or supervision was the "moving force" behind the alleged violation. Therefore, summary judgment is granted as to Plaintiff's claims for Monell liability under the theory of failure to train and supervise employees in the County's human resources department and solicitor's office.

## E.   Count IV: 42 U.S.C. § 1983 - Fourteenth Amendment and Due Process

In Count IV of his Complaint, Plaintiff brings an additional claim pursuant to § 1983, alleging that Defendants Ferman, Vance, Gallen, Justice, Forzato, and Bernstiel denied him equal protection as to his employment and statutory benefits.[35] (Pl.'s Compl. 13 ¶ 51.) Plaintiff further claims that the same individual defendants "denied the Plaintiff of statutory [sic] entitled Heart & Lung benefits because of his race, and Ferman denied Plaintiff of the property

---

[35] The remaining individual defendants listed under Count IV were dismissed from this case on February 23, 2010 (Doc. 12).

interest in the benefit without valid or adequate due process." (Pl.'s Compl. 12-13 ¶ 50.)
Defendants do not challenge that any of the named defendants acted under color of state law;
instead, Defendants dispute the fact that those individuals deprived Plaintiff of his rights to Equal
Protection and Due Process. (See Defs.' Mot. 36-43.)

### (1) Equal Protection[36]

The Fourteenth Amendment provides: "[n]o State shall . . . deny to any person within its
jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To bring a
successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove
the existence of purposeful discrimination." Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d
Cir. 1990) (citation omitted). "They must demonstrate that they received different treatment
from that received by other individuals similarly situated." Id. (internal quotation marks and
citation omitted). Like Title VII race discrimination claims, the purposeful discrimination
element of a plaintiff's § 1983 Equal Protection claim is analyzed according to the McDonnell
Douglas framework. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 n.1 (1993).

For the same reasons discussed at length above with respect to Plaintiff's Title VII claim,
there are outstanding genuine issues of material fact regarding the reasons for Plaintiff's
termination, which precludes a finding of summary judgment. However, as noted above in the

---

[36] In addition to addressing his Equal Protection claim in his response brief, Plaintiff's
brief contains a separate section titled "42 USC 1983 - Race." Generally, when a plaintiff asserts
a § 1983 claim that alleges race discrimination, and the plaintiff does not specify the
constitutional basis for that claim, it is proper to construe it as a claim under the Equal Protection
Clause. See Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1079 (3d Cir. 1990). To the
extent that Plaintiff attempts to bring a new claim under 42 U.S.C. § 1981, such a claim was not
pled in Plaintiff's Complaint and will not be considered by the Court.

context of Plaintiff's First Amendment retaliation claims, Plaintiff does not, with precision, attach responsibility to individual defendants for Plaintiff's termination. "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). As the record contains evidence that Ferman, Vance, and Gallen all participated in the decision to terminate Plaintiff, the Court will deny summary judgment on Plaintiff's § 1983 Equal Protection claim with respect to these defendants. Having found insufficient evidence of record that defendants Forzato, Bernstiel, or Justice were involved in the decision to terminate Plaintiff without offering him the opportunity to resign, summary judgment is granted as to these three defendants.

Plaintiff also alleges that Plaintiff was not treated equally as three similarly-situated white County employees who received Heart and Lung Act benefits from the County. (Pl.'s Resp. 57.) Regardless of whether Plaintiff has raised issues of fact, which would preclude summary judgment on this issue, Plaintiff does not attach responsibility for this action to any individual defendant. As discussed above, the Court finds that no individuals currently remaining as defendants in this lawsuit meaningfully participated in the decision to *deny* Heart and Lung benefits, as alleged by Plaintiff. Therefore, Plaintiff may not go forward on his § 1983 Equal Protection claim as it relates to the administration of his Heart and Lung benefit claim.

### (2) *Due Process*

The Fourteenth Amendment also provides procedural protections for individuals before they may be deprived of a state-created property right. These protected property rights "are

47

normally not created by the Constitution.  Rather, they are created and their dimensions are defined by an independent source such as state statutes or rules entitling the citizen to certain benefits." <u>Shuman ex rel Shertzer v. Penn Manor Sch. Dist.</u>, 422 F.3d 141, 149 (3d Cir. 2005) (internal quotations and citations omitted).

As noted above, defendants do not challenge Plaintiff's state-created property right to Heart and Lung benefits.  (<u>See</u> Defs.' Mot. 36-42.)  Rather, Defendants argue that they have satisfied the requirements for due process.  (<u>Id.</u>)  Plaintiff contends, in his response to Defendants' Motion for Summary Judgment, that he was denied due process because he was not given a hearing related to his Heart and Lung Act benefit claim, (Pl.'s Resp. 53-57), and because he was not permitted to arbitrate his termination and the denial of Heart and Lung Act benefits, (<u>see</u> Pl.'s Resp. 15-21).

(a) Heart and Lung Act benefits

The Court first notes its difficulty determining precisely what Plaintiff is claiming and against whom, in Paragraph 50 of his Complaint, despite a careful and liberal reading.  On its face, the Court interprets the first clause of Paragraph 50[37] to inadvertently mirror Plaintiff's Equal Protection claim in Paragraph 51.  The second clause of Paragraph 50[38] is then read to

---

[37] The first clause of Paragraph 50 of Plaintiff's Complaint reads as follows: "Defendants Risa Vetri Ferman, James R. Matthews, Joseph M. Hoeffel, Bruce L. Castor Jr., Oscar P. Vance Jr., Samuel Gallen, Edmund Justice, Carolyn T. Carluccio, Toni Luter, Stephen Forzato and Mark Bernstiel denied the Plaintiff of statutory [sic] entitled Heart & Lung benefits because of his race . . ." (Pl.'s Compl. 12-13 ¶ 50.)

[38] The second clause of Paragraph 50, separated from the first clause by a comma, reads "and Ferman denied Plaintiff of the property interest in the benefit without valid or adequate due process." (<u>Id.</u>)

assert a separate claim against Risa Ferman only for denying Plaintiff due process with respect to his Heart and Lung Act benefits.  However, as discussed at length above, the Court has found that Risa Ferman did not participate in or approve of any decision to *deny* Plaintiff Heart and Lung Act benefits.

Even under a more strained interpretation of Paragraph 50, if the Court were to read this paragraph as asserting a due process claim for the denial of Heart and Lung Act benefits against all individual defendants named in the paragraph, Plaintiff's claim could not advance at this stage.  As discussed, none of the individuals that the Court has found to have participated in the decision to deny Plaintiff's Heart and Lung Act benefits is a defendant currently named in this suit.

(b) Termination

Under even the most expansive interpretation of Paragraph 50 of Plaintiff's Complaint, the Court simply cannot identify any language that would support Plaintiff's claim that he was denied due process with respect to his termination.  Plaintiff's factual contentions connected with his due process claim contain neither the word termination nor any synonymous word or phrase; rather, Plaintiff's due process allegations in Count IV appear confined to the issue of Heart and Lung Act benefits.  Although Paragraph 51, under Count IV, makes reference to "employment," Plaintiff refers in this paragraph to equal protection only.[39]  Therefore, the Court holds that any

---

[39] Paragraph 51 states, in relevant part, "Defendants . . . denied the Plaintiff of equal protection of law to employment and statutory benefits."  (Pl.'s Compl. 13 ¶ 51.)

claim that Plaintiff was denied due process by Risa Ferman or other individual defendants, insofar as it relates to Plaintiff's termination, cannot advance to trial in this matter.

### F.   Count V: Pennsylvania Human Relations Act ("PHRA")

Finally, Defendant seeks summary judgment against Plaintiff's claims under the PHRA.[40] (See Defs.' Mot.) The analysis of claims for discrimination and retaliation brought under the PHRA is identical to that of claims brought under Title VII. See, e.g., Jones v. Sch. Dist. of Phila., 198 F.3d 403 (3d Cir. 1999). Therefore, Defendant's Motion is denied with respect to Plaintiff's PHRA claims for discrimination and retaliation against Montgomery County for the reasons discussed previously with respect to Plaintiff's Title VII claims.

The PHRA also expands the relief provided by Title VII by prohibiting:

> any person, employer, employment agency, labor organization or employe [sic], to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

43 Pa. Cons. Stat. § 955(e).   "[A]n *individual* supervisory employee can be held liable under an aiding and abetting/accomplice liability theory pursuant to § 955(e) for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision." Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C., 20

---

[40] In addition to his claims under Title VII, Plaintiff has alleged illegal discrimination and retaliation against Defendant Montgomery County in violation of the PHRA as well as individual liability against various County supervisors, pursuant to 43 Pa. Const. Stat. § 955(e) for aiding and abetting the County's discriminatory practices.   (Pl.'s Compl. 13-14.)

F. Supp. 2d 885, 887 (E.D. Pa. 1998) (citing Dici v. Commonwealth of Pa., 91 F.3d 542, 552-53 (3d Cir. 1996) (emphasis added)). Liability under the PHRA for aiding and abetting in discrimination and retaliation turns on an individual defendant's direct involvement in those unlawful practices or his failure to respond where he knew or should have known of such practices. Dici, 91 F.3d at 552-53.

Plaintiff alleges in his Complaint that individual defendants Ferman, Vance, Gallen, Justice, Bernstiel, and Forzato, in their capacity as supervisory employees for Montgomery County, aided and abetted the County's policies of discrimination and retaliation.[41] (Pl.'s Compl. 13-14.) Although Plaintiff does not directly address this particular claim in his brief with clarity, Plaintiff bases his claims of discrimination and retaliation primarily on the acts of Ferman, Vance, Gallen, and Forzato, each of whom served in a supervisory role to Plaintiff. For example, as noted above, Ferman testified that the decision to terminate Plaintiff was discussed with and based in part on discussions with Chief Vance and Deputy Chief Gallen. For the reasons discussed at length above, summary judgment is denied with respect to Plaintiff's claims under Count V against Ferman, Vance, Gallen, and Forzato. Summary judgment is granted, however, as to Plaintiff's claims under the PHRA against defendants Justice and Bernstiel, as Plaintiff has failed to provide sufficient evidence of involvement by either individual in the discriminatory or retaliatory practices alleged.[42]

---

[41] The remaining individual defendants listed under Count V have been dismissed from this case on February 23, 2010 (Doc. 12).

[42] Plaintiff's only specific allegation against Lieutenant Bernstiel is that he denied Plaintiff a "start time change" to allow Plaintiff to obtain medical care. (Pl.'s Resp. 7-8, 44-45.) However, Plaintiff's citations to the record on this point, (see Pl.'s Facts 4 ¶ 33), do not appear to clearly support his assertion. Plaintiff's only mention of former Deputy Chief Justice in his brief

### G.   Plaintiff's claim pursuant to 42 U.S.C. § 1986

In a concise argument in his response brief to Defendants' motion, Plaintiff argues that

his § 1986 claim should proceed to trial.  (Pl.'s Resp. 52-53.)  As noted by Defendants, however,

Plaintiff pleads no such claim in his Complaint, nor did he seek leave to add such a claim to his

Complaint at any point.  When asked at oral argument how the Court should interpret Plaintiff's

inclusion of a § 1986 argument in his brief, given that it was not pled, Plaintiff's counsel stated

"if it's indicated in the complaint, it simply says 1983 et al.  So that put them on notice that any

of the claims under the et al. after 1983 were subject to being brought."  (Hr'g Tr. 44-45,

4/28/2011.)  Any attempt by Plaintiff to plead a claim under § 1986 did not satisfy the

requirements under Federal Rule of Civil Procedure 8, and therefore, said claim must be

dismissed.


### IV. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff's cross-motion requests that the Court grant summary judgment for Plaintiff on

Count III and Count IV of his Complaint, which allege deprivations of Plaintiff's due process

rights in violation of 42 U.S.C. § 1983.[43]  For the same reasons discussed above with respect to

---

relates to Justice's treatment of a former NET employee.  (See Pl.'s Resp. 19.)  Plaintiff also did
not make any mention of Defendant Justice or Bernstiel during oral argument.

[43] The proposed Order attached to Plaintiff's Motion (Doc. 32) requests that the Court
grant summary judgment on "the Fourteenth Amendment Count IV claim" against Montgomery
County.  (Pl.'s Mot. (Doc. 32) at 24.)  As discussed in detail above, however, Count IV of
Plaintiff's Complaint contains a claim against individual County employees; Plaintiff's claim for
municipal liability is listed as Count III in his Complaint.  The conclusion of Plaintiff's Motion
states that Plaintiff is entitled to summary judgment against *both* the County and Risa Ferman for
"deprivation of due process claims related to the denial of property (Heart and Lung benefits and
employment)."  (Id. at 22.)  Upon renewing his Motion, Plaintiff sought summary judgment

Defendants' Motion for Summary Judgment on Count IV, Plaintiff's Motion is denied and

Defendants' Motion is granted. For the reasons discussed as to Count III, Plaintiff's claim for

municipal liability against Montgomery County, which asserts that the County violated Plaintiff's

Due Process rights when handling his claim for Heart and Lung benefits, Plaintiff's Motion is

also denied.

     An implementing order follows.

---

against the County and Risa Ferman as to his Fourteenth Amendment Due Process claim "in
regards only to the Heart and Lung Benefits." (Pl.'s Reply (Doc. 84) at 1.) The proposed Order
attached by Plaintiff to his second reply once again mistakenly lists Count IV as a claim against
both the County and Risa Ferman, though claims against the County are actually listed as Count
III in Plaintiff's Complaint. (Pl.'s Reply (Doc. 84) at 18). However, since Plaintiff states in his
proposed Order that he seeks summary judgment against the County, the Court will interpret
Plaintiff's Motion as pertaining to both Counts III and IV on the issue of an alleged Due Process
violation related to Plaintiff's Heart and Lung Act benefits.